AO 106 (Rev. 04/10) Application for a Search Warrant

**FILED**
U.S. District Court
District of Kansas

# UNITED STATES DISTRICT COURT

for the

District of Kansas

AUG 1 7 2021

Clerk, U.S. District Court
By _____ Deputy Clerk

In the Matter of the Search of

*(Briefly describe the property to be searched or identify the person by name and address)*

the residence and devices located at
206 State Street, Cottonwood Falls, Kansas,
as further described in Attachment A

)
)
)
)
)

Case No. 21- 6141-GEB

## APPLICATION FOR A SEARCH WARRANT

I, a federal law enforcement officer or an attorney for the government, request a search warrant and state under penalty of perjury that I have reason to believe that on the following person or property *(identify the person or describe the property to be searched and give its location)*:

the residence and devices located at 1206 State Street, Cottonwood Falls, KS, as described in Attachment A

located in the _____ District of _____ Kansas _____ , there is now concealed *(identify the person or describe the property to be seized)*:

See Attachment B

The basis for the search under Fed. R. Crim. P. 41(c) is *(check one or more)*:

☑ evidence of a crime;

☑ contraband, fruits of crime, or other items illegally possessed;

☑ property designed for use, intended for use, or used in committing a crime;

☐ a person to be arrested or a person who is unlawfully restrained.

The search is related to a violation of:

| Code Section | Offense Description |
|---|---|
| 18 U.S.C. 2261A(2)(b) | Stalking |
| 18 U.S.C. 875(d) | Interstate Communications |

The application is based on these facts:

See Attached Affidavit of Probable Cause.

☑ Continued on the attached sheet.

☐ Delayed notice of _____ days (give exact ending date if more than 30 days: _____ ) is requested under 18 U.S.C. § 3103a, the basis of which is set forth on the attached sheet.

_____
*Applicant's signature*

Andrew Campbell, SA, FBI
*Printed name and title*

Sworn to before me and signed in my presence.

Date: 17 Aug 21 @ 1:15 pm

_____
*Judge's signature*

City and state: Wichita, KS

The Honorable Gwynne E. Birzer, US Magistrate Judge
*Printed name and title*

# UNITED STATES DISTRICT COURT
for the
District of Kansas

IN THE MATTER OF THE SEARCH OF:
THE RESIDENCE AND DEVICES AT
206 STATE STREET
COTTONWOOD FALLS, KANSAS
as further described in Attachment A

Case No. 21-6141-GEB

## AFFIDAVIT IN SUPPORT OF AN
## APPLICATION FOR A SEARCH WARRANT

I, Andrew P. Campbell, being first duly sworn, hereby depose and state as follows:

1.      I make this affidavit in support of an application for a warrant to search the premises and devices located at **206 STATE STREET, COTTONWOOD FALLS, KANSAS** (TARGET RESIDENCE) further described in Attachment A, for the things described in Attachment B.

2.      I am a Special Agent with the Federal Bureau of Investigation, and have been since January 2016.  As a Special Agent of the FBI, I am authorized to investigate violations of laws of the United States, and I am a law enforcement officer with authority to execute arrest and search warrants under the authority of the United States, including violations of Title 18, United States Code § § 875(d) and 2261A(2)(b).

3.      This affidavit is intended to show only that there is sufficient probable cause for the requested warrant and does not set forth all of my knowledge about this matter.

## STATUTORY DEFINITIONS

4.      Title 18, United States Code, Section 2261A (Stalking), and specifically subsection (2)(b) of that statute, criminalizes the following conduct:

Whoever, with the intent to kill, injure, harass, intimidate, or place under surveillance with intent to kill, injure, harass, or intimidate another person, uses the mail, any interactive computer service or electronic communication service or electronic communication system of interstate commerce, or any other facility of interstate or foreign commerce to engage in a course of conduct that causes, attempts to cause, or would be reasonably expected to cause substantial emotional distress to that person, an immediate family member, or the spouse of that person.

5.      Title 18, United States Code, Section 875 (Interstate Communications), and specifically subsection (d) of that statute, criminalizes the following conduct:

Whoever, with intent to extort from any person, firm, association, or corporation, any money or other thing of value, transmits in interstate or foreign commerce any communication containing any threat to injure the property or reputation of the addressee or of another or the reputation of a deceased person or any threat to accuse the addressee or any other person of a crime.

## PROBABLE CAUSE

6.      Highly summarized, this investigation involves a pattern of threatening and harassing communications and conduct, beginning in approximately June 2017 and continuing to August 12, 2021, undertaken by William C. Yeager (YEAGER). Communications were initially directed at A.M. (VICTIM 1). Since July 2018, the pattern of threatening and harassing communications and conduct have included D.B. (VICTIM 2). YEAGER's course of conduct has involved communications in the form of emails, phonecalls, and voicemails, and includes the posting of videos and other online content. These communications and posting have had the aim of harassing and intimidating VICTIM 1 and VICTIM 2, and have been undertaken with the intent to force National Public Radio to acquiesce to his demands.

### Background on William C. Yeager

2

7.      William C. Yeager   (YEAGER) maintains a residence at 206 State Street in Cottonwood Falls, Kansas. He is known to travel, typically in February, for several weeks at a time but has consistently returned to his residence in Cottonwood Falls. Currently, from report of local law enforcement, he is residing at this address in Cottonwood Falls.

8.      YEAGER has been married to Anais Yeager since approximately 2005.

9.      YEAGER   is   known   to   use   and   operate   the   email   account, william_anais@yahoo.com. This email address has been used by YEAGER in the CM/ECF filing system in the federal courts, as reflected in the lawsuits he has filed (discussed below). Additionally, a search warrant (discussed below) for this account revealed multiple logins, throughout September, October, November, and December of 2019 and into early January 2020, that returned to an AT&T U-Verse internet connection subscribed to by YEAGER at his residence in Cottonwood Falls, Kansas.

**Background on Lawsuits with NPR**

10.     In March of 2017, National Public Radio (NPR) published a story[1] involving a test pressing of an album offered for sale through the website, Discogs, which was cancelled by due to concerns of fraud. The story identified YEAGER as the producer of the album, and opined:

> "He is, it seems, the seller who posted 301 Jackson St. on Discogs. He's also likely the buyer. Which means that $18,000 never changed hands and also raises the possibility that the test pressing of 301 Jackson St. does not exist at all."

---

[1] This story is available online at: https://www.npr.org/sections/therecord/2017/03/23/521216130/the-most-expensive-record-never-sold

The story goes on to chronicle other alleged hoaxes and acts of self-promotion by YEAGER.

11.     Approximately a month later, YEAGER contacted NPR via email, using his william_anais@yahoo.com account, to complain about the story and demand a retraction.

12.     YEAGER has since filed multiple lawsuits against NPR in the Districts of Kansas, Arkansas, Massachusetts, Wisconsin, and most recently in the District of Columbia. The Kansas, Arkansas, Massachusetts and D.C. lawsuits have been dismissed for failure to state a claim; the Wisconsin lawsuit has not proceeded as service of the complaint(s) on NPR have not been effectuated. See, e.g., District of Columbia case 20-CV-00755-RC, Doc. 31, Order of Dismissal (discussing posture of cases); see also District of Massachusetts case 20-CV-30028, Doc. 9, Order of Dismissal.

13.     During the pendency of these lawsuits, YEAGER has represented himself and has been in communication with attorneys representing NPR, including VICTIM 1 and VICTIM 2, frequently by email and occasionally by telephone.

14.     From the outset, YEAGER's communications with VICTIM 1 have been abusive and threatening. As discussed below, YEAGER's course of conduct has included posting information to publicly available websites, and reaching out to associates of VICTIM 1 to allege she caused him to attempt suicide. As a result of YEAGER's continued harassment, NPR has changed its security procedures, specifically as to VICTIM 1, and reassigned VICTIM 1 to a different role.

4

15.     Likewise, YEAGER's course of conduct has included reaching out to family members and associates of VICTIM 2 and alleging VICTIM 2 has engaged in criminal activity.

16.     Due to the threatening and harassing nature of these communications, District Judge Rudolph Contreras (District of Columbia) issued an order on February 12, 2021, that YEAGER shall not contact the NPR attorneys' family members or acquaintances, and that YEAGER shall refrain from use of harassing or abusive language in communicating with the attorneys (including VICTIM 1 and VICTIM 2). See District of Columbia case 20-CV-00755-RC, Doc. 28, Order. Despite this admonition, YEAGER has continued to engage in harassing communication with both VICTIM 1 and VICTIM 2.

**YEAGER begins communicating with A.M. (VICTIM 1)**

17.     In early June 2017, A.M. (VICTIM 1) an attorney working for NPR and located in Washington, DC, was assigned to investigate YEAGER's complaint as a part of her official duties. As part of normal practice, NPR assembled a team of editors and legal counsel to investigate YEAGER's claims.

18.     On June 16, 2017, VICTIM 1 sent an email to YEAGER at his william_anais@yahoo.com account, advising "Your letter to [NPR Counsel] was forwarded to me. I am the person to talk to about any concerns about defamation. Please let me know what you consider to be false, and we will promptly review the material."

19.     On that same day, at approximately 12:28 p.m., YEAGER called VICTIM 1. As VICTIM 1 later reported to NPR Security, YEAGER first wanted to verity that VICTIM 1 was a

lawyer and worked for NPR. He then asserted he was a humanitarian, an activist, and a very spiritual man. After listening to YEAGER for several minutes, VICTIM 1 advised the fastest way for her to address the issue is for YEAGER to tell her what he thought was false so we can review the story and the underlying facts. YEAGER put his wife on the phone, who VICTIM 1 described as "crying hysterically." YEAGER took the phone back and began screaming a stream of obscenities and "I am going to fucking come after you bitch," "I am going to fucking sue you for 50 million dollars." YEAGER then hung up the phone. YEAGER later called back to apologize.

20.     Also on June 16, 2017, YEAGER sent several emails to VICTIM 1 from his william_anais@yahoo.com. These emails purported to convey details of his life and connections in the entertainment industry. YEAGER also expressed that he "held the cards" and would "put a hurting on NPR like no tomorrow if you disrespect me." YEAGER explained that his "hurt has turned to anger" and that his anger was "righteous anger." In closing to a lengthy email, YEAGER wrote:

> So as I said, add insult to injury with me and I will fight with a vengeance. William Yeager AND his wife that you degraded and that I will fight and die for. How much do you think that is worth?

21.     On June 19, 2017, VICTIM 1 emailed YEAGER to advise NPR was reviewing the "materials" he had sent, and advised "it would be helpful if you could identify in one email all of the factual inaccuracies you believe are in the story."

22.     Over the next several weeks, YEAGER continued to email VICTIM 1, from his william_anais@yahoo.com account. Rather than identify any factual inaccuracies (such as provide

the identity of the buyer or seller), YEAGER responded "Do you really need ME to tell YOU what is wrong? I do find this a bit insulting. Injury to insult." YEAGER expressed his belief he had been chosen by God to be a "messenger" and further advised that, in his "righteous anger, I must do what I must do… this article / story… all of it, defames Gods Prophet." YEAGER further recounted an alleged suicide attempt, where his wife "had to watch me with a knife sticking to my throat." YEAGER stated "When I arrive… I will have been fasting for 30 days, and I will see you in court… vengeance is mine saith the Lord." YEAGER also sent a number of links to videos, advised he uploaded a password-protected video material to be shared with NPR management and provided the password, and advised he owned/operated a website identified as billyyeager.com.[2] While YEAGER's emails repeatedly threaten to sue NPR, YEAGER's emails also include threats to damage the reputation of NPR and others in the court of public opinion.

23.     On July 5, 2017, VICTIM 1 emailed YEAGER requesting specific information about what YEAGER claimed was wrong in the story, including specific requests for contact information for individuals YEAGER claimed had pertinent information. YEAGER responded to that request by disclaiming his knowledge and otherwise refusing to provide any information. YEAGER followed that with another email, from william_anais@yahoo.com, with a quotation ending "the lamp of the wicked will be put out."

---

[2] This website remains active, and links to many of the other websites or videos referenced herein.

24.     On November 9, 2017, YEAGER sent a comparatively brief email to VICTIM 1, which concluded "my 'Time' is near."

25.     On January 8, 2018, YEAGER appears to have created or enlisted others to create another website,[3] purportedly to chronicle his impending lawsuit. This website include a variety of videos, images, and purported interviews.

26.     Within this website is a description, purportedly written by Damon Blalack, an individual identified on the website as YEAGER's manager and publicist.[4] The description indicates the author traveled to meet Dolph (the alleged buyer of the album in the story on NPR) at Dolph's home, on May 5, 2017.[5] The website includes two pictures, purportedly of Dolph, holding what appears to be the album at the heart of story:

_____

[3] This website is available, and remains active, at: https://lawsuitnprspin2018.wordpress.com/2018/01/08/billy-yeagers-18000-00-record-album-and-400-million-dollar-lawsuits/

[4] It is unclear who is actually the author of this rambling and disjointed scroll, because at one point the author writes "On September 6th, Damon Blalack called me and said 'Did you see this news?'" indicating the author is someone other than Damon Blalack.

[5] While the year of this meeting does not appear in the article, the posting occurred on January 8, 2018 and the content indicates "Dolph" had a printed version of the NPR March 2017 article.



Dolph has his own printed copy of the NPR and Spin articles laying on his desk. He makes himself another margarita and throws the NPR article down on the folding chair next to him.

*"You see that? To Kill a Mocking Bird, isn't it?"*

27.     On July 3, 2017, VICTIM 1 received a call from Damon Blalack, claiming to have statements from the buyer and seller of the album, but refusing to provide either's identifiers.

28.     Dolph is specifically referenced (below) in more recent threatening communications from YEAGER.

### YEAGER files his first lawsuit

29.     In March 2018, YEAGER filed a lawsuit in Kansas naming both NPR and VICTIM 1 in the suit.  The suit alleged, among other things, defamation of YEAGER as a result of NPR's reporting.  NPR hired outside legal counsel, D.B. (VICTIM 2) an attorney located in Phoenix, Arizona. to assist VICTIM 1 in the lawsuit.

### YEAGER escalates his references to violent acts

9

30.     On April 10, 2018, YEAGER emailed VICTIM 1 a lengthy email via william_anais@yahoo.com. This email generally expressed YEAGER's belief that he had been wronged and that he had already won. He recounted various spiritual beliefs and experiences. YEAGER also directed VICTIM 1 "make sure your attorney whoever they are reads this, this proud person who thinks they are going to take me down is going to hang themselves in humiliation with a rope like Judas when they are done."

31.     On July 23, 2018, as part of the "meet and confer" call in the civil suit, VICTIM 2 spoke with YEAGER by phone. VICTIM 2 recounted this conversation with NPR Security, advising YEAGER asked whether they wanted to find themselves dealing with a "lunatic" who "shot everybody up?" and further asked whether they wanted to find themselves in a "bloody mess?"[6] YEAGER continued to speak of his "righteous anger" and "I can make your life miserable."

32.     On July 24, 2018, VICTIM 2 spoke with YEAGER by phone and YEAGER stated he wanted to drive to DC to meet with "decision makers" that he was a "divine messenger" and angrily stated he had "war plans" and "Hiroshima is coming."

33.     On July 26, 2018, YEAGER sent an email to VICTIM 2 via william_anais@yahoo.com, referencing his plan to drive to DC and then advising he was willing

_____

[6] In light of the timing and proximity, it is believed YEAGER was referencing the Capital Gazette shooting less than a month prior, on June 28, 2018.

to drive to VICTIM 2 (in the same email, he later advised he would never drive to VICTIM 2). YEAGER closed by including a hyperlink to a wordpress.com website indicating he had (as of at least January 8, 2018) begun posting material online.[7]

34.     On that same day, YEAGER emailed VICTIM 2 via william_anais@yahoo.com and, in closing, stated:

> I said "tick tock" nobody took me serious again. What a bloody mess. Just because an "injured" war soldier has lost his faith, cannot stand anymore due to hunger and a serious injury, doesn't mean he has lost his weapons.

35.     On August 17, 2018, YEAGER emailed VICTIM 2, acknowledging he had made calls to NPR employees demanding information relative to VICTIM 1. YEAGER would later claim this was simply his effort to investigate his claim and obtain discovery.

36.     On October 2, 2018, YEAGER emailed VICTIM 2 via william_anais@yahoo.com. In his email, YEAGER advsied that if he lost his case he intended to set himself on fire on the steps of NPR, but only after cutting off each of his fingers and mailing them to VICTIM 1 and 2. YEAGER also advised of his intent to post "my manifesto" online. He further advised "I am ready to die for this cause" and told VICTIM 2 to "bring the marshmallows and come on out to the burn party, and when my fingers arrive, bag them up and sell them on E-bay if you like."

---

[7] This page referenced in the URL remains active, and is available at:
https://lawsuitnprspin2018.wordpress.com/2018/01/08/billy-yeagers-18000-00-record-album-and-400-million-dollar-lawsuits/

37.    On   November   15,   2018,   YEAGER   emailed   VICTIM   2   via william_anais@yahoo.com. In this email, YEAGER advised "I don't need the lower courts and these laws, I have the courts of public opinion to go to."  This again signaled YEAGER's intention to go outside the legal process.

38.    On   November   22,   2018,   YEAGER   emailed   VICTIM   2   via william_anais@yahoo.com. In this email, YEAGER described hanging himself and advised "Have a Great Thanksgiving with your family at this cease fire, but soon unfortunately we will take up swords again, and I will slay anything and everything in my path for the Truth and Justice".

39.    On February 28, 2019, YEAGER emailed Jonathan Hart, Chief Legal Officer at NPR, via william_anais@yahoo.com, and told him, "All of you who defend this travesty are going to pay dearly." He further advised "Free speech…remember? Works both ways. Think about that [VICTIM 1] and Flanagan…..lets see how you like this…freedoms…"

40.    On October 20, 2019, YEAGER emailed Jonathan Hart with a link to a video posted on YouTube. The video contains a voice-over accompanying a mish-mash of clips from various news outlets, with some of the clips deriving from YEAGER's purported filmography. This video available at the link included the names of VICTIM 1 and 2, as well as pictures and video of VICTIM 1 and 2.

41.    On   December   11,   2019,   YEAGER   emailed   VICTIM   1   via william_anais@yahoo.com, with the subject line "GRIM REAPER FOR YOU". The message called VICTIM 1 a scumbag, stated "you are going to pay dearly," and claimed "God will get His

revenge for each one of you, trust me." He concluded his email "There is a judgement day you know."

42.     On December 12, 2019, YEAGER sent VICTIM 2 an email which, along with threatening to sue VICTIM 2 personally. He concluded, "You have no idea what is in my filings."

### YEAGER expresses his intention to involve VICTIM 2's family

43.     On December 31, 2019, YEAGER emailed VICTIM 2 via william_anais@yahoo.com and accused VICTIM 2 of trying to murder YEAGER. He referenced trying to cut off his own fingers with an electric skill saw.

44.     YEAGER also advised he would be mailing material to VICTIM 2's home address (and provided it) advising "your wife will be finding out the truth of what she married, my people will make sure, anyone and everyone who knows you both, such as those society magazines in Phoenix, and so much more." Aside from threatening to involve VICTIM 2's wife, YEAGER indicates he has individuals who will assist him in the undertaking.

45.     YEAGER further advised that "the internet allows you to find everything you want, and if it costs 19.95 to get that, even I can afford it, so understand that this letter and others including a DVD of our videos have been sent to many of your neighbors and [VICTIM 2's} also, the website gives names, addresses and there is no law being broke, (because blackmail is asking for something, I don't want anything from you)". He advised "32 DVD's were sent by my helpers, there will be more to come."

### YEAGER's appeal to the Supreme Court

13

46.     Following the denial of his petition for certiorari with the Supreme Court (relative to his Kansas lawsuit), YEAGER filed a petition for rehearing which states the denial for rehearing has left him with three choices, the first two being: "1. A DECLARATION OF THE 2ND AMENDMENT OF MY RIGHT TO BEAR ARMS AGAINST THE GOVERNMENT AND THE SUPREME COURT AND ITS TYRANTS AND ITS TRAITORS. 2. MY RIGHT TO AVENGE MY ENEMIES SEEKING MY OWN JUSTICE DESTROYING THOSE WHO DESTROYED MY FAMILY." Later in the petition, YEAGER states "I am now declaring a Revolution against this Supreme Court and its nine Justices who are TRAITORS TO THE BILL OF RIGHTS AND THIS COUNTRY" and announcing he would "STAND ON MY SECOND AMENDMENT RIGHT TO BEAR ARMS AGAINST THE GOVERNMENT."

**YEAGER's is connected to other accounts used to harass VICTIM 1**

47.     In February 2020, as part of a different investigation into YEAGER for harassing conduct involving another individual/other individuals, a search warrant was served to Oath Holdings Inc. (Yahoo.com) for the william_anais@yahoo.com account.  The return showed the account had Internet Protocol logins between September 2019 and January 2020 from an AT&T account.  The return also showed the secondary email address was gregbondmusic@gmail.com.[8]

---

[8] This email had been identified in another investigation, as used to communicate with the spouse of a Justice of the Supreme Court.

14

48.     On May 4, 2020, records were received from AT&T for the Internet Protocol logins for the william_anais@yahoo.com account. The records showed that the AT&T account used to login to the email account was assigned to William YEAGER with an address of 206 State Street in Cottonwood Falls, Kansas.  The account also listed a phone number of (785) 409-8023, which was known to be YEAGER's.

49.     In July 2020, American University (where VICTIM 1 is adjunct faculty) received emails from "Greg Bond" via gregbondmusic@gmail.com (the secondary email address for william_anais@yahoo.com) claiming that VICTIM 1 is responsible for "putting someone in the hospital for suicide" and "responsible for destroying the hopes of poor children in 3rd world countries" and asking if American University is planning to remove her as faculty. The emails also contained a link to https://williamyeagervnpr.com/, a website purportedly chronicling the making of a documentary about his lawsuit(s) and containing YEAGER's pleadings. The website connects to various videos, as well as linking to other YEAGER related websites.

50.     In September 2020, VICTIM 1 found a post on Reddit.com, titled *[VICTIM 1's name] NPR Satanic Attorney and NPR Jihadist Agendas* and was created by reddit user "musicmatterstome" and stated that NPR "promotes jihadist Agendas" and claimed VICTIM 1 is a "Satanist who destroyed innocent childrens lives." This commentary was frighteningly similar

to the Pizzagate conspiracy theory, which migrated from a 4Chan forum to Reddit and Twitter and turned into a mass shooting.[9]

51.     Open source checks conducted in September 2020, showed a similar Facebook fan page titled *[VICTIM 1's name] NPR Satanic Attorney* which contained edited photographs of VICTIM 1 holding a placard or paper referencing a lawsuit filed by YEAGER.  The page also had a post with a video titled *The NPR Satanic agenda to destroy America 2021*. This page has since been removed, though it appears the video remains available via YouTube.

52.     In October 2020, records received from Reddit, Inc. showed Reddit user "musicmatterstome" had the same registration IP as the AT&T account for YEAGER and the email address used for the account was gregbondmusic@gmail.com, indicating YEAGER was involved in the posting of that information.

### YEAGER continues his harassment and intimidation tactics

53.     On March 17, 2020, YEAGER filed a *pro se* civil suit in the District Court for the District of Columbia Case 1:20-cv-00755 naming NPR and several others as defendants. Specifically, in paragraph 55 of YEAGER's complaint, he states, "As of today the plaintiff continues to be under medical treatment for major depression, suicidal ideation, extreme mood swings, erratic risky behavior and desire to hurt himself and attack those who have abused him, humiliated him, caused him extreme pain, and stripped him from everything that he worked for in

---

[9] https://time.com/4590255/pizzagate-fake-news-what-to-know/

his life." Despite appearing in a pleading, the historical communications between YEAGER and VICTIM 1 and VICTIM 2 indicated YEAGER had expressed a desire to attack them.

54.     On April 23, 2020, YEAGER emailed VICTIM 2 via william_anais@yahoo.com, calling VICTIM 2 "a liar, a snake, a deceptive no good piece of shit" and advising "[m]y doctor takes notes of every detail in our sessions with my wife, every single detail, they have known for all these years every aspect of this case and your intentional pushing of myself to the brink of insanity, hoping perhaps I would go bezerk [sic] on a shooting rampage or something..."

**YEAGER claims he received anonymous threats against VICTIM 2's life**

55.     On December 2, 2020, YEAGER sent an email to VICTIM 2 began: "I received an anonymous phone call from someone who said they were going to kill all of you."

56.     Many paragraphs later, YEAGER explained: "The phone call I received was from a person who said he had been following the case, reading the files . . . . He then said he didn't have long to live[,] he was dying of cancer and said, 'don't worry Billy" I will terminate all of them, referring to you." YEAGER then added: "I don't know who it was, it was late, they hung up, just thought you should know." YEAGER closes his email by saying: "Remember. No bad deed will go unpunished."

57.     On January 26, 2021, YEAGER sent an email to VICTIM 2 which began "Two attorneys and a husband and wife die on day, pass into the air, all that withers, to dust we arrive, and dust we return." After lobbing insults, YEAGER states "the courts of public opinion is coming, and you will wish you committed suicide, and perhaps you will. But your day is coming, I already

17

tried to reason with you courteously and send scriptures, I thought you would advance, and that perhaps the spirit could enter your being, but you both have gone too far gone, so there is no more to say to you . . . your going to hell, and before you do, your going to watch your family and siblings pay dearly, because the scripture strictly tells it so, generation upon generations, your sins, passed on to another…" YEAGER goes on to say "There is a surprise for both of you soon, some links Damon[10] will be sending."

58.     On February 1, 2021, in District of Columbia case 20-CV-00755, YEAGER filed a motion (Doc. 22) which alleged VICTIM 2 was calling him at 2:00am, but then stated the caller "who would not introduce himself nor stop talking stated that he was contacting all of [VICTIM 2's] family members and places where they worked, and that he was going to inform them that [VICTIM 2] had raped a young girl that was friends with his daughter." He further stated, "I am also contacting the FBI regarding the matter, anything regarding a rape by [VICTIM 2] is a serious matter, I do not even understand what this all means, however . . .these calls come from an unlisted and unreturnable number, and lawyers have a way of being able to do these types of things very easily." Notably, YEAGER did not and has not contacted the FBI regarding this allegation.

**YEAGER contacts VICTIM 2's daughter**

_____

[10] This appears to be a reference to Damon Blalack, an individual who appears to assist YEAGER in operating or creating his websites. Blalack appears in some of YEAGER's videos, and is alleged to be YEAGER's publicist.

18

59.     Later that same day, YEAGER sent a message to the daughter of VICTIM 2, using his william_anais@yahoo.com account. The message began, "I know you have something fun: What I filed and what your father is doing involving you maybe..." and provided a hyperlink to the pleading above (filed as Doc. 22 in D.C. case 20-CV-00755) which alleged her father (VICTIM 2) had engaged in a sex crime.

60.     On February 2, 2021, YEAGER sent another message to the daughter of VICTIM 2 from his william_anais@yahoo.com account. In his email, YEAGER begins, "3 years ago my wife had to lift my lifeless body off of a stool, where she found me with a rope around my neck, wanting to hang myself. That was 1 of two suicide attempts. I tell you this because I believe that your father David does not want you to know the truth about any of this."

61.     VICTIM 2's daughter immediately forwarded these messages to VICTIM 2.

### YEAGER is ordered to cease his harassment

62.     On February 8, 2021, YEAGER filed a motion (Doc. 24) in District of Columbia case 20-CV-00755-RC. In this pleading, YEAGER claimed VICTIM 2 had lied to the Court, claiming the abusive screams heard during a call he made to VICTIM 2's office were actually directed at his wife.

63.     YEAGER includes apparent screen captures of his purported medical records, which again advise of his stated intention to douse himself with gasoline. The screen captures also include, in the middle of the medical records, a picture of a boat on a trailer on a public street

19

engulfed in flame. The medical records go on to note a history of paranoia and thoughts of hurting others.

64.    In the pleading, YEAGER admits to twice contacting VICTIM 2's daughter.

65.    YEAGER goes on to state that, two year earlier, he purchased a firearm and included a screen capture of a picture titled "Anais shooting_1.jpg" which purports to show his wife shooting at a human-shaped target at a gun range.

66.    The foregoing screen captures all appear to be from a computer using an Apple operating system, as the example (from page 24) below shows:



Additionally, close inspection of one of the screen captures (on page 16) in his pleading appears to show YEAGER had his william_anais@yahoo.com email account open in another window:



67.    YEAGER's motion resulted in an order (District of Columbia case 20-CV-00755-RC, Doc. 28, Order) issued on February 12, 2021. That order directed YEAGER to have no contact the NPR attorneys' family members or acquaintances, and further directed YEAGER to refrain from use of harassing or abusive language in communicating with the attorneys (including VICTIM 1 and VICTIM 2).

20

**YEAGER resumes his threats towards VICTIMS 1 and 2 and their families**

68.     On August 10, 2021, District Judge Rudolph Contreras filed his order dismissing District of Columbia case 20-CV-00755 with prejudice.

69.     Later that same day, YEAGER sent an email to VICTIM 2 via william_anais@yahoo.com, advising "Now I am finished with your fucking games, and your fucking injustice, now I will get justice. Last chance. Is NPR going to remove the article that has destroyed my life including my wife, career, ability to make money, and the pain and misery I have suffered for over 4 years now  yes or fucking no? If not, be very prepared."

70.     On August 12, 2021, YEAGER called VICTIM 1 and left a four and a half minute voicemail shouting that he would hound her, destroy her reputation, and called her and VICTIM 2 various epithets. He advises she will hear from him every day, saying "my threats are all on the fucking internet" and says he will call her neighbors and send things to her neighbors.

71.     On August 13, 2021, YEAGER sent an email to VICTIM 2 via william_anais@yahoo.com, advising he "was informed that the buyer, (who is only known as Dolph and refuses to give his true identity) has been following the case and reading every single case file, following the lawsuits, all because he was holding onto and hoping he would have to present the record album as evidence that it did exist. Now he has read this last denial, and it seems that shit is going to hit the fan as they say, and you and your family and others are targets."

72.     YEAGER goes on to say "I have NOTHING to do with this, but in all honesty let me also make this clear, I am thoroughly going to enjoy every moment of what proceeds in the

near future. You see Dolph,[11] is in contact with only one person and that one person refers information to Gary Brice,[12] who gives this information to Damon and is then given to myself 'verbally.'"

73.     YEAGER continues, advising "Dolph it appears has struck up a friendship with one the 'JOM Revolution'[13] team members, something none of you took serious, you thought I was pretending to be everyone I presume." He then goes on to explain that an individual who appears in one of his videos is a graffiti artist in South America who is in contact with Gary Brice.

74.     YEAGER goes on to explain "Dolph has indicated that he is taking his funds, (which is substantial from what I understand) and it using it to destroy all of you on the internet. Your daughter [name redacted], he has begun, seems that he read the documents, seems that he knows your not affected by any of this, but Gary has told me that he told the artist in South America that he is creating a [daughter of VICTIM 2] porn web-site, seems he hired a detective and somehow, don't ask me how, has located a video on porn hub, or hub porn ( I don't know) and your daughter is in this video doing some bad things." To clarify, YEAGER has stated Dolph told the

---

[11] According to other information posted on YEAGER's January 8, 2018 website (referenced above in paragraph 25), Dolph has already been in direct contact with YEAGER's associate Damon Blalack (or whomever is the author of the webpage).

[12] Gary Brice is an apparent associate of YEAGER's, and appears in one of the videos posted to the same webpage describing the May 5, 2017 interview of Dolph.

[13] This is a reference to YEAGER's "Jesus of Malibu" film.

artist, who told Gary, who told Damon, who verbally told YEAGER, that Dolph is creating a pornography website featuring images of VICTIM 2's daughter.

75.     YEAGER later states, "Also [VICTIM 1] and her family is going to be on Dolphs list, and so are the other 18 people that are listed in the last lawsuit."

76.     On August 14, 2021, YEAGER sent an email via william_anais@yahoo.com to VICTIM 2 and another attorney at NPR, stating:

> Hey . ..bunghole face and pencil dick, you don't faze me. I have every right to write you, you two twits are not defendants, and I don't have to address you both as anything more than a nasty pink pimple on a whores ass. Fuck off. Sincerely William  Yeager

77.     From the foregoing, it is apparent that YEAGER has access to a phone, as well as a computer, and is using these devices to facilitate his communications and online harassment. It is likely these devices will be found at his residence. Moreover, as YEAGER is known to travel (and images from his websites frequently depict him in front of or near his recreational vehicles), those vehicles, described in Attachment A, may similarly contain evidence of his activities, as described in Attachment B.

78.     Because YEAGER has advised he has "helpers" who are aiding him in his efforts to harass VICTIM 1 and VICTIM 2, it is likely that his residence as described in Attachment A, and more specifically the devices at his residence, contain evidence of the identities of these individuals and/or communications with these individuals, as well as the materials that he has purportedly produced and/or sent as part of his efforts to harass and intimidate VICTIM 1 and VICTIM 2.

79.     Additionally, it appears he has been in contact with Damon Blalack regarding "Dolph" from as far back as 2017, and is likely in possession of evidence or information which may be used to identify "Dolph" or, alternatively, demonstrate that "Dolph" is a fiction created by YEAGER and being deployed as a means of threat, harassment and intimidation. This evidence, described in Attachment B, is likely to be found at the residence as described in Attachment A.

80.     Because YEAGER has repeatedly referenced mass-shooting and his acquisition of a firearm, including a picture of his wife shooting a handgun, it is likely that YEAGER has firearms in the residence described in Attachment A which have been used to intimidate, and which may be used to harm, VICTIM 1 and VICTIM 2.

## COMPUTERS, ELECTRONIC STORAGE, AND FORENSIC ANALYSIS

81.     As described above and in Attachment B, this application seeks permission to search for records that might be found at the TARGET RESIDENCE, as described in Attachment A, in whatever form they are found.  One form in which the records might be found is data stored on a computer's hard drive or other storage media.  Thus, the warrant applied for would authorize the seizure of electronic storage media or, potentially, the copying of electronically stored information, all under Rule 41(e)(2)(B).

82.     *Probable cause.*  I submit that if a computer or storage medium is found at the TARGET RESIDENCE, there is probable cause to believe those records will be stored on that computer or storage medium, for at least the following reasons:

    a. Based on my knowledge, training, and experience, I know that computer files or remnants of such files can be recovered months or even years after they have been

24

downloaded onto a storage medium, deleted, or viewed via the Internet. Electronic files downloaded to a storage medium can be stored for years at little or no cost. Even when files have been deleted, they can be recovered months or years later using forensic tools. This is so because when a person "deletes" a file on a computer, the data contained in the file does not actually disappear; rather, that data remains on the storage medium until it is overwritten by new data.

b. Therefore, deleted files, or remnants of deleted files, may reside in free space or slack space—that is, in space on the storage medium that is not currently being used by an active file—for long periods of time before they are overwritten. In addition, a computer's operating system may also keep a record of deleted data in a "swap" or "recovery" file.

c. Wholly apart from user-generated files, computer storage media—in particular, computers' internal hard drives—contain electronic evidence of how a computer has been used, what it has been used for, and who has used it. To give a few examples, this forensic evidence can take the form of operating system configurations, artifacts from operating system or application operation, file system data structures, and virtual memory "swap" or paging files. Computer users typically do not erase or delete this evidence, because special software is typically required for that task. However, it is technically possible to delete this information.

d. Similarly, files that have been viewed via the Internet are sometimes automatically downloaded into a temporary Internet directory or "cache."

83. *Forensic evidence.* As further described in Attachment B, this application seeks permission to locate not only computer files that might serve as direct evidence of the crimes described on the warrant, but also for forensic electronic evidence that establishes how computers were used, the purpose of their use, who used them, and when. There is probable cause to believe that this forensic electronic evidence will be on any storage medium in the TARGET RESIDENCE because:

a. Data on the storage medium can provide evidence of a file that was once on the storage medium but has since been deleted or edited, or of a deleted portion of a file (such as a paragraph that has been deleted from a word processing file). Virtual

25

memory paging systems can leave traces of information on the storage medium that show what tasks and processes were recently active. Web browsers, e-mail programs, and chat programs store configuration information on the storage medium that can reveal information such as online nicknames and passwords. Operating systems can record additional information, such as the attachment of peripherals, the attachment of USB flash storage devices or other external storage media, and the times the computer was in use. Computer file systems can record information about the dates files were created and the sequence in which they were created, although this information can later be falsified.

b. As explained herein, information stored within a computer and other electronic storage media may provide crucial evidence of the "who, what, why, when, where, and how" of the criminal conduct under investigation, thus enabling the United States to establish and prove each element or alternatively, to exclude the innocent from further suspicion. Information stored within a computer or storage media (e.g., registry information, communications, images and movies, transactional information, records of session times and durations, internet history, and anti-virus, spyware, and malware detection programs) can indicate who has used or controlled the computer or storage media. This "user attribution" evidence is analogous to the search for "indicia of occupancy" while executing a search warrant at a residence. The existence or absence of anti-virus, spyware, and malware detection programs may indicate whether the computer was remotely accessed, thus inculpating or exculpating the computer owner. Further, computer and storage media activity can indicate how and when the computer or storage media was accessed or used. For example, as described herein, computers typically contain information that log: computer user account session times and durations, computer activity associated with user accounts, electronic storage media that connected with the computer, and the IP addresses through which the computer accessed networks and the internet. Such information allows investigators to understand the chronological context of computer or electronic storage media access, use, and events relating to the crime under investigation. Additionally, some information stored within a computer or electronic storage media may provide crucial evidence relating to the physical location of other evidence and the suspect. For example, images stored on a computer may both show a particular location and have geolocation information incorporated into its file data. Such file data typically also contains information indicating when the file or image was created. The existence of such image files, along with external device connection logs, may also indicate the presence of additional electronic storage media (e.g., a digital camera or cellular phone with an incorporated camera). The geographic and timeline information described herein may either inculpate or exculpate the computer user. Last, information stored

26

within a computer may provide relevant insight into the computer user's state of mind as it relates to the offense under investigation. For example, information within the computer may indicate the owner's motive and intent to commit a crime (e.g., internet searches indicating criminal planning), or consciousness of guilt (e.g., running a "wiping" program to destroy evidence on the computer or password protecting/encrypting such evidence in an effort to conceal it from law enforcement).

c.  A person with appropriate familiarity with how a computer works can, after examining this forensic evidence in its proper context, draw conclusions about how computers were used, the purpose of their use, who used them, and when.

d.  The process of identifying the exact files, blocks, registry entries, logs, or other forms of forensic evidence on a storage medium that are necessary to draw an accurate conclusion is a dynamic process. While it is possible to specify in advance the records to be sought, computer evidence is not always data that can be merely reviewed by a review team and passed along to investigators. Whether data stored on a computer is evidence may depend on other information stored on the computer and the application of knowledge about how a computer behaves. Therefore, contextual information necessary to understand other evidence also falls within the scope of the warrant.

e.  Further, in finding evidence of how a computer was used, the purpose of its use, who used it, and when, sometimes it is necessary to establish that a particular thing is not present on a storage medium. For example, the presence or absence of counter-forensic programs or anti-virus programs (and associated data) may be relevant to establishing the user's intent.

84.  *Necessity of seizing or copying entire computers or storage media.* In most cases, a thorough search at a residence or physical location for information that might be stored on a computer or digital storage media often requires the seizure of the computer or digital storage media and later off-site review consistent with the warrant. In lieu of removing storage media from the TARGET RESIDENCE, it is sometimes possible to make an image copy of storage media. Generally speaking, imaging is the taking of a complete electronic picture of the computer's data,

27

including all hidden sectors and deleted files. Either seizure or imaging is often necessary to ensure

the accuracy and completeness of data recorded on the storage media, and to prevent the loss of

the data either from accidental or intentional destruction. This is true because of the following:

    a.   The time required for an examination. As noted above, not all evidence takes the form of documents and files that can be easily viewed on site. Analyzing evidence of how a computer has been used, what it has been used for, and who has used it requires considerable time, and taking that much time at the TARGET RESIDENCE could be unreasonable. As explained above, because the warrant calls for forensic electronic evidence, it is exceedingly likely that it will be necessary to thoroughly examine storage media to obtain evidence. Storage media can store a large volume of information. Reviewing that information for things described in the warrant can take weeks or months, depending on the volume of data stored, and would be impractical and invasive to attempt on-site.

    b.   Technical requirements. Computers can be configured in several different ways, featuring a variety of different operating systems, application software, and configurations. Therefore, searching them sometimes requires tools or knowledge that might not be present on the search site. The vast array of computer hardware and software available makes it difficult to know before a search what tools or knowledge will be required to analyze the system and its data at the TARGET RESIDENCE. However, taking the storage media off-site and reviewing it in a controlled environment will allow its examination with the proper tools and knowledge.

    c.   Variety of forms of electronic media. Records sought under this warrant could be stored in a variety of storage media formats that may require off-site reviewing with specialized forensic tools.

    85.   *Nature of examination.* Based on the foregoing, and consistent with Rule

41(e)(2)(B), the warrant I am applying for would permit seizing, imaging, or otherwise copying

storage media that reasonably appear to contain some or all of the evidence described in the

warrant, and would authorize a later review of the media or information consistent with the

warrant. The later review may require techniques, including but not limited to computer-assisted

28

scans of the entire medium, that might expose many parts of a hard drive to human inspection in order to determine whether it is evidence described by the warrant.

86.    Because two people share the TARGET RESIDENCE as a residence, it is possible that the TARGET RESIDENCE will contain storage media that are predominantly used, and perhaps owned, by persons who are not suspected of a crime.  If it is nonetheless determined that that it is possible that the things described in this warrant could be found on any of those computers or storage media, the warrant applied for would permit the seizure and review of those items as well.

## CONCLUSION

87.    I submit that this affidavit supports probable cause to believe that the TARGET RESIDENCE located at 206 State Street in Cottonwood Falls, Kansas, as described in Attachment A, does contain evidence of violations of 18 U.S.C. § 875(d) and 2261A(b)(2), and therefore I respectfully request that this Court issue a search warrant for the search of the premises and devices located at 206 State Street in Cottonwood Falls, Kansas, as described in Attachment A, which incorporated by reference as if fully set forth herein, authorizing the seizure and search of the items described in Attachment B herein.

Respectfully submitted,

Andrew P. Campbell
Special Agent
Federal Bureau of Investigation

29

Subscribed and sworn to before me on _____August 17_____, 2021.

GWYNNE E. BIRZER
UNITED STATES MAGISTRATE JUDGE

**ATTACHMENT A**

*Property to be searched*

The residence and devices located 206 State Street, Cottonwood Falls, Kansas, further

described as follows:

206 State Street, Cottonwood Falls, KS 66845, is a two-story, single-family home.  It is on the southeast corner of Main Street and State Street, the second house from Main.  It is across the street from the Chase County Jr.-Sr. High School.  It is painted white, with light grey shingles and a turquoise front door.  In the front there is a covered concrete front porch, several large trees, a large bush, and a sidewalk.  There is an older brown Dodge Class C recreational vehicle, covered with a blue tarp, parked on the north side of the house.  There is an older white fifth-wheel recreational vehicle with a blue awning parked on a gravel driveway on the south side of the house.  There is a covered patio on the south side of the house, and a gravel alleyway behind the house.

## ATTACHMENT B

*Property to be seized*

1.     Any and all computer devices (including desktops, laptops, tablets, smartphones, as well as the hardware, peripherals, software, computer related documentation, passwords and data security devices, and storage devices), including the software or programs or applications contained therein, that have been and/or may be used to commit the crimes of stalking and threatening interstate communications, as described in the attached affidavit of probable cause.

2.     Any and all cameras, film, videotapes or other photographic equipment, which may be used to capture, create, edit, modify, or duplicate images or videos of VICTIM 1, VICTIM 2, or their respective family members, which have been and/or may be used to commit the crimes of stalking and threatening interstate communications, as described in the attached affidavit of probable cause.

3.     Any and all notes, documents, records, correspondence, in any format and medium (including, but not limited to, envelopes, letters, papers, diaries, manifestos, manuals, email messages, chat logs and electronic messages, and handwritten notes) pertaining to VICTIM 1, VICTIM 2, and/or their respective family members.

4.     Any and all notes, documents, records, correspondence, in any format and medium (including, but not limited to, envelopes, letters, papers, diaries, manifestos, manuals, email messages, chat logs and electronic messages, and handwritten notes) pertaining to plans to contact, harm, harass, intimidate, and/or threaten VICTIM 1, VICTIM 2, and/or their respective family members.

2

5.      Any and all notes, documents, records, correspondence, in any format and medium, pertaining to the operation, ownership, and/or usage of the accounts and websites referenced in the attached affidavit of probable cause (and specifically including william_anais@yahoo.com, gregbondmusic@gmail.com, and the Reddit "musicmatterstome" user account) which have been and/or may be used to commit the crimes of stalking and threatening interstate communications, described in the attached affidavit of probable cause.

6.      Any and all images or videos, in any format or medium, of VICTIM 1, VICTIM 2, and/or their respective family members.

7.      Any and all documents, records, or correspondence, in any format or medium (including, but not limited to, envelopes, letters, papers, email messages, chat logs and electronic messages, and other digital data files such as pictures or videos), pertaining to the identity and location of Dolph, as described in the attached affidavit of probable cause, and including evidence demonstrating Dolph is a fiction, such as the prop or album observed in the photos.

8.      Any and all documents, records, or correspondence, in any format or medium (including, but not limited to, envelopes, letters, papers, email messages, chat logs and electronic messages, and other digital data files), pertaining to occupancy or ownership of the TARGET RESIDENCE described above, including, but not limited to, rental or lease agreements, mortgage documents, rental or lease payments, utility and telephone bills, mail envelopes, or addressed correspondence.

9.      Any and all records, documents, invoices and materials, in any format or medium (including, but not limited to, envelopes, letters, papers, email messages, chat logs and electronic

messages, and other digital data files) that concern any accounts with an internet service provider, electronic communications provider, and telephone service.

10.    Any and all records, documents, invoices and materials, in any format or medium (including, but not limited to, papers, email messages, chat logs and electronic messages, bookmarks, user IDs, cookies, browser and search history, and other digital data files) that identify websites used, accessed, created, and/or edited for the purpose of harassing or intimidating VICTIM 1, VICTIM 2, or their family members.

11.    Any and all records, documents, invoices and materials, in any format or medium (including, but not limited to, papers, email messages, chat logs and electronic messages, bookmarks, user IDs, cookies, browser and search history, and other digital data files) that concern encryption, deletion, or destruction of evidence.

12.    Any and all firearms and ammunition, which have been and/or may be used to commit the crimes of stalking and threatening interstate communications, described in the attached affidavit of probable cause.